UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CASSIE STULTS,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

Hon. Ellen S. Carmody

Case No. 1:11-cv-1239

## **OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On April 3, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #9).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

# **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 27 years old on her alleged disability onset date.  (Tr. 138).  She successfully completed high school and worked previously as a cook's assistant, teacher's aide, and Certified Nursing Assistant.  (Tr. 19, 177).

Plaintiff applied for benefits on August 17, 2010, alleging that she had been disabled since July 7, 2010, due to migraines, blackouts, and memory loss.  (Tr. 138-46, 176).  Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 85-137).  On June 29, 2011, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff, Plaintiff's husband, and vocational expert, David Holwerda.  (Tr. 32-84).  In a written decision dated July 22, 2011, the ALJ determined that Plaintiff was not disabled.  (Tr. 11-20).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-4).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **RELEVANT MEDICAL HISTORY**

In 2008, Plaintiff was diagnosed with pseudotumor cerebri[1] which was treated by placement of a ventriculoperitoneal shunt. (Tr. 367). On December 21, 2009, Plaintiff participated in a CT examination of her brain the results of which revealed "shunt catheter in place, unchanged" and "no acute abnormalities." (Tr. 271).

On January 27, 2010, Plaintiff participated in an MRI examination of her lumbar spine the results of which were "normal." (Tr. 227). On February 11, 2010, Plaintiff was examined by Dr. Patrick Ronan. (Tr. 222-23). Plaintiff reported that she was experiencing lower back pain. (Tr. 222). Plaintiff was "in no distress" and walked "with a normal gait." (Tr. 222). An examination of Plaintiff's spine revealed the following:

> Inspection of the patient's spine reveals a slight increase in the normal lumbar lordosis secondary to obesity. Hip heights are symmetric. There is no Trendelenburg.[2] Trunk motion is limited by 50 to 60 percent with flexion, extension, and lateral bending, with pain indicated in the same area over the left low back, just above waist line.

(Tr. 222).

A musculoskeletal examination revealed "hip rotation, flexion, adduction, and FABER[3] elicit no remarkable symptoms in the groin or sacroiliac area." (Tr. 222). A neurologic

---

[1] Pseudotumor cerebri occurs "when the pressure inside [the] skull. . .increases for no obvious reason." *See* Pseudotumor Cerebri, available at http://www.mayoclinic.com/health/pseudotumor-cerebri/DS00851 (last visited on March 20, 2013). The symptoms "mimic those of a brain tumor, but no tumor is present." Medications "often can reduce this pressure, but in some cases, surgery is necessary." *Id.*

[2] Trendelenburg's sign is designed to assess the strength of an individual's hip abductors. *See* Trendelenburg's Sign and Hip Abductor Exercises, available at: http://www.livestrong.com/article/425133-trendelenburgs-sign-and-hip-abductor-exercises/ (last visited on March 20, 2013). The test is performed in a standing position with your feet shoulder width apart. You then slowly lift one foot off the ground, balancing on your other foot. A positive test is when the hip of your non weight-bearing leg drops or is lower than the other side, indicating that the hip abductors on your weight-bearing leg are weak and cannot stabilize your pelvis. *Id.*

[3] FABER (or Patrick) test is "a screening test for pathology of the hip joint or sacrum." *See* Special Tests of the Lower Extremity, available at http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.htm (last visited on March 20, 2013). The test is performed by placing the patient in the supine position and then flexing one leg and placing the foot of that leg on the opposite knee. The examiner then slowly presses down on the superior aspect of the tested knee joint lowering the leg into further abduction. The motion thus

4

examination revealed "sensation, strength, and reflexes are preserved in the lower limbs" and "straight leg raising is asymptomatic." (Tr. 222). The doctor recommended that Plaintiff continue participating in physical therapy. (Tr. 223). The doctor further noted that Plaintiff can continue to perform "light duty" work. (Tr. 222-23). The results of a March 21, 2010 examination were unremarkable and Dr. Ronan concluded that Plaintiff could "return to normal activities." (Tr. 224).

Treatment notes dated March 15, 2010, indicate that Plaintiff recently participated in a series of "arthritis tests" the results of which were "normal." (Tr. 257-59). X-rays of Plaintiff's knee, taken on June 2, 2010, revealed: (1) no fracture or other acute bony abnormality; (2) no arthritic change; and (3) no joint effusion. (Tr. 269). X-rays of Plaintiff's skull, taken on June 27, 2010, revealed that "the ventriculoperitoneal shunt appears intact in the head and the neck." (Tr. 256). On June 28, 2010, Plaintiff participated in a CT scan of her brain the results of which revealed "no acute abnormalities." (Tr. 255).

X-rays of Plaintiff's skull, chest, and abdomen, taken on July 12, 2010, revealed "intact shunt catheter from interventricular portion through the peritoneum" with "no evidence of...shunt malfunction." (Tr. 263-64). A CT examination of Plaintiff's head, performed the same day, revealed "no acute intracranial process" and "stable appearance of the brain without evidence of hydrocephalus or other acute intracranial process." (Tr. 265-66).

On July 12, 2010, Plaintiff reported to the emergency room complaining of a "decreased level of consciousness." (Tr. 348-49). Plaintiff's husband reported that Plaintiff "was complaining of [a] headache earlier today and is now acting more painful and decreased." (Tr. 348). The doctor noted that Plaintiff "was able to walk to her husband's truck, but then was fairly unable

---

performed is referred to as FABER - **F**lexion, **AB**duction, **E**xternal **R**otation at the hip. The results are positive if the patient experiences "pain at the hip or sacral joint, or if the leg can not lower to point of being parallel to the opposite leg." *Id.*

5

to move or cooperate once in the ER." (Tr. 348). The results of a physical examination were unremarkable. (Tr. 349). The results of a CT scan were likewise "normal." (Tr. 349). The doctor was unable to determine a cause for Plaintiff's complaints and, furthermore, observed that Plaintiff was acting in a "melodramatic" manner. (Tr. 349).

On August 5, 2010, Plaintiff was examined by Dr. Ronan. (Tr. 225-26). Plaintiff reported that she was experiencing "diffuse left knee pain." (Tr. 225). A physical examination revealed the following:

> Patient ambulates without a limp. Hip rotation and flexion are benign. Inspection of the knee reveals no obvious effusion. Discomfort is reported with palpation over the medial and lateral joint lines and less over the collateral ligament. There is no pain or instability with varus, valgus stress,[4] or Lachman's.[5] Anterior drawer[6] is negative. McMurray's[7] elicits no remarkable findings. Clark[e]'s[8] is provocative. Sensation, strength, and reflexes are preserved in the lower limbs. Straight leg raising is negative.

(Tr. 225). X-rays of Plaintiff's knee revealed the following: (1) preserved medial and lateral compartments; (2) the articular surfaces are smooth; and (3) the patellofemoral joint is unremarkable. (Tr. 225).

On August 11, 2010, Plaintiff began participating in outpatient counseling at Pine

---

[4] The varus and valgus stress tests are methods by which to assess "one-plane lateral instability" and "one-plane medial instability" of the knee, respectively. *See* Valgus and Varus Stress Test, available at http://www.pthaven.com/page/show/102192-valgus-and-varus-stress-test (last visited on March 20, 2013).

[5] Lachman's test is used to determine whether a patient has suffered a tear of the anterior cruciate ligament. *See*, *e.g.,* Lachman's Test, available at http://www.fpnotebook.com/Ortho/Exam/LchmnTst.htm (last visited on March 20, 2013).

[6] The anterior drawer test is a method by which to assess "one-plane anterior instability" of the knee. *See* Anterior Drawer Test, available at http://www.pthaven.com/page/show/102189-anterior-drawer-test-two-angles- (last visited on March 20, 2013).

[7] McMurray's sign refers to the occurrence of a clicking sound during the manipulation of the knee, which is indicative of an injury of a meniscus of the knee joint. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* M-72 (Matthew Bender) (1996).

[8] Clarke's test (a.k.a. patellar grind test) "assesses the presence of abnormal patellar movement." *See* Patellofemoral Pain Syndrome, available at http://morphopedics.wikidot.com/patello-femoral-pain-syndrome (last visited on March 20, 2013).

Rest Christian Mental Health Services. (Tr. 288-93). Plaintiff reported that she experiences "periods of depression and mania" and "also experiences panic attacks." (Tr. 288). Plaintiff appeared "sad," but the results of a mental status examination were unremarkable. (Tr. 290-91). Plaintiff was diagnosed with bipolar disorder, panic disorder without agoraphobia, and anxiety disorder. (Tr. 293). Plaintiff's GAF score was rated as 65.[9] (Tr. 293).

On September 28, 2010 Plaintiff completed a report regarding her activities. (Tr. 187-94). Plaintiff reported that she gets up in the morning and helps her children get ready for school after which she performs various housekeeping chores. (Tr. 187). She reported that when her children return home from school she helps them with their homework and then prepares dinner. (Tr. 187). Plaintiff reported that she prepares meals, cleans her house, washes laundry, washes dishes, drives a car, and shops. (Tr. 188-90). Plaintiff also reported that she reads, sews, and watches television. (Tr. 191).

On November 11, 2010, Plaintiff participated in a nuclear medicine ventriculoperitoneal shunt study the results of which revealed "normal ventriculoperitoneal shunt study without evidence of shunt malfunction." (Tr. 385). X-rays of Plaintiff's chest, abdomen, and skull, taken on November 11, 2010, revealed that "the shunt tubing appears grossly intact." (Tr. 384).

On December 17, 2010, Plaintiff was examined by Dr. James Ranta. (Tr. 370). With respect to Plaintiff's pseudotumor cerebri, the doctor reported that "it has been progressive with speech deficits, gait abnormality and somewhat mechanical speech that she has been experiencing,

---

[9] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 32.

7

and yet through the emergency department evaluation of her shunt and her pressures were normal." (Tr. 370). The doctor further noted that Plaintiff's situation "is complicated, and it does seem that some of this is psychiatrically based." (Tr. 370). The doctor further noted, however, that Plaintiff was neither seeking psychiatric treatment nor using her prescribed asthma medications. (Tr. 370).

On January 6, 2011, Plaintiff was examined by Dr. John Oltean at Shoreline Vision. (Tr. 304-08). An examination revealed that Plaintiff was experiencing a "side vision" visual field defect of the right eye. (Tr. 308). An examination of Plaintiff's left eye revealed "normal visual field findings." (Tr. 308).

On January 21, 2011, Plaintiff was examined by Dr. Christopher Glisson with St. Mary's Neuroscience Program who performed a neuro-ophthalmic examination. (Tr. 362-64). Plaintiff's husband reported that Plaintiff "was clinically stable" until approximately July 2010, after which she was "in and out of the emergency department" for evaluation of headaches and blackouts. (Tr. 362). Plaintiff's husband reported that these episodes "persist for 1-2 hours, and resolve after treatment in the emergency department with intravenous Reglan and Toradol." (Tr. 362). With respect to these events, the doctor observed that "interestingly, Ms. Stults reports complete amnesia of these events." (Tr. 362). Plaintiff reported that these episodes "were initially occurring every other weekend but are now occurring less than once per month." (Tr. 362). Plaintiff also reported that she experienced less severe headaches once or twice weekly. (Tr. 362). The doctor noted that Plaintiff "appears to have no difficulty following our conversation...provide[d] accurate information and is fully oriented," but her speech "is exceedingly slow and halting with a slightly non-organic character." (Tr. 363). The doctor observed that Plaintiff's "gait" is "narrow-based and steady" and she "is able to arise from the examination chair independently and demonstrates symmetric arm

8

swing with normal ambulation." (Tr. 363). The results of a neuro-ophthalmic examination revealed the following:

> Apart from recently corrected refractive error, afferent neuro-visual function is entirely normal. There is no evidence of decreased acuity, dyschromatopsia visual field constriction or retinal nerve fiber layer abnormality by OCT to implicate increased intracranial pressure or recurrence of pseudotumor cerebri.

(Tr. 364).

On January 23, 2011, Plaintiff participated in a CT examination of her head the results of which revealed the following: (1) no change in the appearance of the brain; (2) the shunt appears unchanged; (3) no evidence of hydrocephalus; and (4) no other acute abnormalities. (Tr. 379-80). On February 8, 2011, Plaintiff participated in an MRI examination of her brain the results of which were "normal." (Tr. 377).

On June 13, 2011, Plaintiff participated in an EEG examination. (Tr. 388-90). During the examination, Plaintiff appeared to experience a "spell" which was described as follows:

> The event occurred during wakefulness. The patient is watching TV when she is seen to close her eyes and start grimacing. Upon questioning, she has periods where she can answer questions and follow commands intermixed with brief intervals with poor interaction and responsiveness. She indicated that she had a severe migraine. Her eyes remain mostly closed; she moans and shifts in place, and seems much like in pain, writhing. Occasionally bicycling movements of the lower extremities are seen. This event was quite prolonged lasting almost 45 minutes. It was witnessed by her husband, and they both felt this event was typical for her.

(Tr. 389-90).

The doctor noted, however, that "no EEG changes were seen during the spell" and that "no interictal epileptiform abnormalities were seen." (Tr. 390). The doctor concluded that "these findings provide evidence to support that Cassie's spells are non-epileptic in origin and that

9

she does not suffer from epilepsy." (Tr. 390). The doctor reported that instead "it appears evident that all her spells are triggered by a severe headache/migraine." (Tr. 390).

At the Administrative Hearing, Plaintiff reported that "it's a matter of time before my vision's completely gone." (Tr. 55-56). Plaintiff reported that she experiences headaches "1-2 times a week" and experiences blackouts "at least 1 or 2 times a week." (Tr. 56). Plaintiff testified that she experienced lower back pain which limited her ability to sit and stand for prolonged periods of time. (Tr. 60-62). Plaintiff also testified that she was suffering from arthritis in her left knee. (Tr. 63). Plaintiff reported that her knee "will give out" if she has to "stand too long." (Tr. 64-65). Plaintiff also reported that she experiences pain and numbness in her hands "a few times a week" which impairs her ability to hold or handle objects. (Tr. 66). Plaintiff testified that "a few times a week" she experiences numbness and tingling in her feet which makes it difficult for her to walk more than "a few feet." (Tr. 66-67). Plaintiff reported that she experiences difficulty sleeping and will often go three full days without any sleep. (Tr. 67). Plaintiff reported that she was taking medication to treat her panic attacks and that she had not experienced any such attack in "a couple months." (Tr. 69-70).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[10] If the Commissioner can make a

---

[10] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) right eye reduced visual field; (2) migraine headaches; and (3) asthma, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-15). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained

---

requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

the capacity to perform light work[11] subject to the following limitations: (1) she can frequently balance, stoop, crawl, and climb ramps and stairs; (2) she can only occasionally kneel, crouch, and climb ladders, ropes, and scaffolds; (3) she must avoid even moderate exposure to workplace hazards; (4) she must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation; and (5) she is limited to simple tasks. (Tr. 16).

The ALJ concluded that Plaintiff was unable to perform any of her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert David Holwerda.

The vocational expert testified that there existed approximately 46,200 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 79-80). This represents a significant number of jobs. *See Born v. Sec'y of*

---

[11] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

*Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

        a.       The ALJ Properly Evaluated Dr. Ranta's Opinion

Dr. Ranta was one of Plaintiff's treating physicians. Plaintiff argues that she is entitled to relief because the ALJ failed to accord proper weight to Dr. Ranta's opinion. While Plaintiff cites to treatment notes documenting the doctor's findings on examination, Plaintiff fails to identify any particular opinion expressed by Dr. Ranta that the ALJ failed to properly assess or weigh or that is inconsistent with the ALJ's RFC determination.

Plaintiff's bare conclusion that the ALJ failed to accord sufficient weight to Dr. Ranta's opinion is insufficient. While the Court can perhaps surmise from the ALJ's decision the opinion to which Plaintiff's argument is directed, such does not relieve Plaintiff of the affirmative obligation to more clearly articulate the basis for her claims of error. *See, e.g., Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waives any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived); *Financial Resources Network, Inc. v. Brown & Brown, Inc.*, 2010 WL 4806902 at *30 n.29 (D. Mass., Nov. 18, 2010) (same). Accordingly, the Court finds that Plaintiff has waived this particular argument. Even if this argument has not been waived, however, the result is the same.

The ALJ identified and considered Dr. Ranta's October 21, 2010, opinion that

13

Plaintiff "is disabled and not going to improve to the point where she can return to gainful employment." (Tr. 376, 387). As the ALJ correctly concluded, the determination of whether a claimant is disabled is a matter reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1). Accordingly, the ALJ accorded "little weight" to this particular opinion. This argument is, therefore, rejected.

b. The ALJ Properly Evaluated Dr. Sheill's Opinion

On January 4, 2011, Plaintiff participated in a consultive examination conducted by Dr. Donald Sheill. (Tr. 297-302). Plaintiff reported that she was disabled due to headaches. (Tr. 301). Plaintiff also reported that she "limps at all times" and must use "a hinged brace." (Tr. 301). The doctor observed that Plaintiff "constantly limped, favoring the left knee," but an examination of Plaintiff's left knee revealed only "mild" swelling and pain with pressure and palpation. (Tr. 302). An examination of Plaintiff's right knee was "unremarkable." (Tr. 302). Dr. Sheill also reported that Plaintiff exhibited "mildly halting and tentative speech." (Tr. 302). The doctor diagnosed Plaintiff with "migraines/pseudotumor," but further noted that "it is unclear if the two are related." (Tr. 302). Plaintiff was also diagnosed with left knee arthritis, obesity, peripheral vision loss in the right eye, and asthma. (Tr. 302). Dr. Sheill concluded that "the current mental issues would make [Plaintiff] unemployable." (Tr. 302). Plaintiff argues that the ALJ failed to properly evaluate Dr. Sheill's opinion. Again, Dr. Sheill's opinion that Plaintiff was "unemployable" concerns a matter, whether Plaintiff is disabled, reserved to the Commissioner. Thus, this argument is also rejected.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.

Date: March 22, 2013          /s/ Ellen S. Carmody
                              ELLEN S. CARMODY
                              United States Magistrate Judge